UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CORY NELSON #417348,

                Petitioner,                               Hon. Robert J. Jonker

v.                                             Case No. 1:18-CV-709

TONY TRIERWEILER,

                Respondent.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Nelson's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Nelson's petition be denied.

## BACKGROUND

As a result of events that occurred on August 10, 2012, Petitioner was charged with armed robbery and felony murder. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

### Kenneth Mack

At approximately 7:00 p.m. on August 10, 2012, Mack encountered Petitioner. (ECF No. 12-6, Trial Transcript at 173, PageID.548).   Approximately an hour later, Mack spoke with Petitioner on the phone.   (*Id.*, PageID.542).   Following this phone call, Mack did not leave his residence, nor did Petitioner come visit him.   (*Id.*, PageID.542-43).   Likewise, neither Deven Nelson, Deshawn Colbert, Sr., nor Deshawn Colbert, Jr., came to Mack's residence that evening.   (*Id.*, PageID.543).

At approximately 4:00 the following morning, the police arrived at Mack's residence to inquire if Mack had any information regarding an incident that occurred nearby.   (*Id.*, PageID.544-45).   Mack was later contacted by Petitioner's girlfriend, Dominique Toggle, who asked Mack to testify untruthfully on Petitioner's behalf. (*Id.*, PageID.545-46).   Specifically, Toggle asked Mack to testify that Petitioner stayed with Mack on August 10, 2012.   (*Id.*).

### Kris Brown

As of August 10, 2012, Brown was employed as a police officer for the City of Battle Creek.   (ECF No. 12-6, Trial Transcript, PageID.550).   At approximately 11:41 that evening, Brown was dispatched to 258 Algonquin to investigate a breaking and entering.   (*Id.*).   Brown parked his patrol car nearby and approached the house in question.   (*Id.*, PageID.551-52).

2

Once near the house, Brown heard a man say, "where's the bags, where's the fucking bags?"    (*Id.*, PageID.552).    An unidentified officer then approached the house and knocked on the door, to which a man inside replied, "who is it?"    (*Id.*). Brown then heard a different man say, "keep him fucking quiet."    (*Id.*).    Shortly thereafter, Brown heard a thud after which he heard an officer yell, "he's going out the front door."    (*Id.*).    Following a brief chase, Brown captured the man in question. (*Id.*, PageID.552-53).    The man was later identified as Deven Nelson.    (*Id.*, PageID.553).

### Chad Fickle

As of August 10, 2012, Fickle was employed as a police officer for the City of Battle Creek.    (ECF No. 12-6, Trial Transcript, PageID.554).    Sometime that evening, Fickle responded to a call of a breaking and entering in progress at 258 Algonquin.    (*Id.*, PageID.554-55).    After arriving at this location, Fickle took up a position near the house.    (*Id.*, PageID.555).    Soon thereafter, Officer Brown approached Fickle and informed him that a man inside the house stated, "where's the bag, where's the fucking bag?"    (*Id.*, PageID.555-56).

After the arrival of several additional officers, Sergeant Case, a member of the Emergency Response Team, approached the house and instructed Petitioner, who was standing in a doorway, to "step out and get on the ground."    (*Id.*, PageID.556). Petitioner did not comply with this command, but instead "slammed the door shut" and retreated inside the house.    (*Id.*).    In response, Fickle and several other officers

3

forced their way into the house at which point Petitioner was taken into custody. (*Id.*, PageID.556-57).

Fickle remained with Petitioner while other officers searched the house and pursued two additional suspects who fled, but were quickly captured.  (*Id.*, PageID.557).   Officers discovered on the house's main floor a firearm and man with "possible head trauma."  (*Id.*).   Once Petitioner was removed from the house, Fickle searched the basement.  (*Id.*, PageID.557-58).   Two people, Deshawn Colbert, Sr., and Ehabb Kelly, were discovered in the basement and taken into custody.  (*Id.*, PageID.558-59).   Fickle also discovered a second firearm in the basement.  (*Id.*, PageID.559-60).

## **Jeffrey Case**

As of August 10, 2012, Case was employed as a Sergeant with the City of Battle Creek Police Department.  (ECF No. 12-7, Trial Transcript, PageID.565).   At approximately 11:41 that evening, Case, who was on road patrol with Sergeant James Martens, was dispatched to investigate a breaking and entering at 258 Algonquin. (*Id.*, PageID.565-66).

Upon his arrival, Case was informed by other officers that there appeared to be an argument taking place inside the house.  (*Id.*, PageID.566).   At some point, one of the doors to the house opened and Case observed a man inside.  (*Id.*).   Case ordered the man to show his hands and step outside, but the man refused and instead "immediately" shut the door.  (*Id.*).

Case responded by forcibly entering the house after which Petitioner was captured. (*Id.*, PageID.566-67). Case then observed two other men fleeing the scene. (*Id.*, PageID.567-68). Case pursued and captured one of these men, DeShawn Colbert, Jr. (*Id.*, PageID.568). Case returned to the house and assisted in a search of the basement where two men were captured, DeShawn Colbert, Sr. and Ehabb Kelly. (*Id.*, PageID.568-70). A search of the basement also revealed a second firearm. (*Id.*, PageID.570).

### Ehabb Kelly

As of August 10, 2012, Kelly resided at 258 Algonquin with his brother, Terrance Evans, and his father, Larry Evans. (ECF No. 12-7, Trial Transcript, PageID.575). Kelly returned home that evening at approximately 9:30. (*Id.*, PageID.576). Kelly greeted his father and then went to the basement to wash laundry. (*Id.*). Approximately ninety minutes later, Kelly heard "people yelling" and "stuff hitting the ground" upstairs. (*Id.*, PageID.576-77). Kelly heard a man yell, "where the bag at?" (*Id.*, PageID.577). Kelly immediately telephoned the police. (*Id.*, PageID.577-78).

Immediately thereafter, DeShawn Colbert, Jr., entered the basement and discovered Kelly. (*Id.*, PageID.578). Colbert returned upstairs and reported that there was a man downstairs, at which point DeShawn Colbert, Sr., and Deven Nelson entered the basement. (*Id.*). Nelson instructed Kelly to "come out" or he would

"shoot the whole basement up." (*Id.*, PageID.581). The police, however, arrived before Nelson located Kelly. (*Id.*, PageID.581-82).

### Terrance Evans

As of August 10, 2012, Evans resided at 258 Algonquin with his brother, Ehabb Kelly, and his father, Larry Evans. (ECF No. 12-7, Trial Transcript, PageID.586-87). At approximately 10:45 that evening, Evans departed to attend a class reunion. (*Id.*). When Evans departed, his brother was in the basement and his father was upstairs watching television. (*Id.*, PageID.587). Evans locked the door to the house when leaving. (*Id.*). By the time Evans returned home, "the street was full of police cars." (*Id.*). Evans was instructed to go to a local hospital where he learned that his father was dead. (*Id.*). No firearms were kept in the house. (*Id.*, PageID.588). Likewise, the family did not possess large amounts of cash or any items of significant value. (*Id.*). Evans did, however, keep in his bedroom a small amount of marijuana for personal use. (*Id.*, PageID.588-89).

### James Martens

As of August 10, 2012, Martens was employed as a Sergeant with the Battle Creek Police Department. (ECF No. 12-7, Trial Transcript, PageID.593). That evening, Martens was "riding as a double unit" with Sergeant Jeffrey Case. (*Id.*). At some point that evening, the pair was dispatched to 258 Algonquin to investigate a breaking and entering. (*Id.*).

6

After arriving, Martens and Case took up positions around the perimeter of the house.  (*Id.*, PageID.593-94).   Soon thereafter, Martens observed Petitioner open a door to the house.  (*Id.*, PageID.594).   Sergeant Case responded by ordering Petitioner to show his hands.  (*Id.*).   Petitioner refused to comply and instead closed the door and returned inside.  (*Id.*).   Sergeant Case forcibly entered the house followed by Martens and other officers at which point Petitioner was captured.  (*Id.*, PageID.594-95).

**Anthony <u>Gancer</u>**

As of August 10, 2012, Gancer was employed as a police officer with the Battle Creek Police Department.  (ECF No. 12-7, Trial Transcript, PageID.598).   Gancer was one of the first officers to arrive at 258 Algonquin that evening to investigate a breaking and entering.  (*Id.*).   Upon approaching the house, Gancer "heard some commotion going on inside" that "sounded like people were arguing and there was some sort of struggle inside."  (*Id.*).   Gancer then heard "two thumps."  (*Id.*).

Shortly thereafter, Sergeant Case forcibly entered the house after which DeShawn Colbert, Jr., and Deven Nelson fled.  (*Id.*, PageID.598-99).   Gancer assisted in capturing these two men after which he returned to the house to assist with the investigation.  (*Id.*, PageID.599-600).   Gancer later collected the clothing Petitioner was wearing at the time of his arrest and presented it to crime technician Brett Weiss.  (*Id.*, PageID.600-01).

### Gregory Gammons

As of August 10, 2012, Gammons was employed as a Sergeant for the City of Springfield Department of Public Safety. (ECF No. 12-7, Trial Transcript, PageID.605). Gammons was also a certified medical first responder. (*Id.*). That evening, having overheard radio traffic concerning a home invasion at 258 Algonquin, Gammons traveled to that location in case additional assistance was needed. (*Id.*).

Gammons attempted to provide medical assistance to Larry Evans. (*Id.*). Gammons observed "a lot of blood on the floor and a lot of blood around [Evans'] head." (*Id.*). Evans stated, "they hit me in the head." (*Id.*). Gammons observed a "large laceration" on the back of Gammons' head surrounded by "a lot of coagulated blood." (*Id.*, PageID.605-06). Due to an inability to physically move or roll Evans, Gammons was unable to determine if Evans was suffering any additional injuries. (*Id.*, PageID.606).

### Michael Bentley

As of August 10, 2012, Bentley was employed as a paramedic. (ECF No. 12-7, Trial Transcript, PageID.606-07). At approximately 11:52 that evening, Bentley was dispatched to 258 Algonquin to treat a man who had suffered a head injury. (*Id.* PageID.607). Bentley was met by Officer Gammons who had bandaged the victim's head. (*Id.*). Bentley and his partner then transported the man to a hospital. (*Id.* PageID.607-08).

### Todd Rathjen

As of August 10, 2012, Rathjen was employed as a lab technician for the Battle Creek Police Department.  (ECF No. 12-7, Trial Transcript, PageID.608).  After hearing the report of a breaking and entering at 258 Algonquin, Rathjen proceeded to that location.  (*Id.*).  Rathjen entered the house where he observed Larry Evans laying on the floor.  (*Id.*, PageID.609).  Evans appeared "disoriented" and kept repeating, "help me, help me."  (*Id.*).  Rathjen stayed with Evans until medics arrived and then assisted with processing the crime scene and collecting evidence. (*Id.*, PageID.609-16).

### Terra Wesseldyk

As of August 11, 2012, Wesseldyk was employed as a lab specialist for the Battle Creek Police Department.   (ECF No. 12-7, Trial Transcript, PageID.619-20). Early that morning, Wesseldyk was dispatched to 258 Algonquin to assist in processing the crime scene.  (*Id.*).  Wesseldyk recovered a Ruger .44 Magnum revolver in the basement.  (*Id.*, PageID.620).  Wesseldyk recovered a 9-millimeter semi-automatic pistol from the dining room area.  (*Id.*, PageID.622).  Both weapons were examined for fingerprints and DNA.  (*Id.*, PageID.620-23).  Wesseldyk also discovered a "duffle bag with what appeared to be marijuana, scales, drug paraphernalia, things used to take drugs into the system."  (*Id.*, PageID.624). Wesseldyk recovered the duffle bag from a bedroom inside a broken television cabinet that appeared to have been padlocked."  (*Id.*, PageID.624-25).

**Joyce DeJong**

DeJong, a forensic pathologist, performed an autopsy of Larry Evans on August 12, 2012.  (ECF No. 12-8, Trial Transcript, July 25, 2013, PageID.635-38).  An external examination revealed a wound to the left temple caused by a bullet fired from "very close" range.  (*Id.*, PageID.640-43).  This injury, however, likely only caused "slight damage" and was not necessarily fatal.  (*Id.*, PageID.647-48).  Evans also suffered several blunt force trauma injuries to the head.  (*Id.*, PageID.640-45).  These latter injuries were consistent with Evans having been struck by a firearm.  (*Id.*, PageID.645).  With respect to internal injuries, Evans suffered 21 rib fractures, bruises to his lungs, and a ruptured spleen.  (*Id.*, PageID.647-48).  The internal injuries Evans suffered were the result of the repeated application of "significant force."  (*Id.*, PageID.649-53).  DeJong characterized Evans' death as a homicide caused by a "gunshot wound to the head and multiple blunt force injuries."  (*Id.*, PageID.654-55).

**Matthew Robinson**

As of August 10, 2012, Robinson was employed as a Sergeant with the Battle Creek Police Department.  (ECF No. 12-8, Trial Transcript, PageID.664).  Specifically, Robinson served as a Supervisor for the police department's crime lab.  (*Id.*, PageID.665).  Late that evening, Robinson was dispatched to 258 Algonquin to assist in processing the crime scene.  (*Id.*).  In one of the bedrooms, Robinson discovered a shell casing consistent with a 9-millimeter semi-automatic pistol.  (*Id.*,

PageID.666-69). This shell casing was discovered in the same bedroom where the suspected marijuana was discovered. (*Id.*, PageID.669-72).

### Brett Weiss

As of August 11, 2012, Weiss was employed as a crime technician for the Battle Creek Police Department. (ECF No. 12-8, Trial Transcript, PageID.685-86). Early that morning, Weiss was dispatched to 258 Algonquin to assist in the investigation of the crime scene. (*Id.*, PageID.686).

Weiss was present when Sergeant Robinson discovered a shell casing in a bedroom. (*Id.*, PageID.687). At that time, it was unknown whether the bullet fired into Larry Evans' temple was still lodged in his brain. (*Id.*). Weiss learned later that morning that there was no bullet present in Evans' body at which point Weiss returned to the crime scene where he discovered a bullet in the floor of the bedroom where the shell casing was discovered. (*Id.*, PageID.687-92). Weiss also collected DNA samples from Petitioner, DeShawn Colbert, Sr., DeShanw Colbert, Jr., and Deven Nelson. (*Id.*, PageID.700-02).

### Heather Clark

Clark, a Michigan State Police Forensic Scientist, performed serology testing on several items of evidence collected in this matter. (ECF No. 12-8, Trial Transcript, PageID.710-12). Specifically, Clark examined the items for the presence of human blood. (*Id.*, PageID.712-25). The items containing human blood were forwarded to others for DNA testing. (*Id.*).

**<u>Lisa</u> <u>Ramos</u>**

Ramos, a Michigan State Police Forensic Scientist, performed DNA testing on several items of evidence collected in this matter. (ECF No. 12-8, Trial Transcript, PageID.738-40). Analysis of the handle of the .44 caliber revolver recovered from the crime scene revealed DNA from three different people. (*Id.*, PageID.754-62). Ramos could not exclude Petitioner as a donor to this biological material. (*Id.*). An examination of Petitioner's shoes revealed DNA from three people. (*Id.*, PageID.764). Ramos was able to exclude DeShawn Colbert, Sr., DeShanw Colbert, Jr., and Deven Nelson as donors to this biological material, however, she was unable to exclude Larry Evans as a donor to such. (*Id.*, PageID.765).

**<u>Jeffery</u> <u>Amley</u>**

Amley, a firearms and toolmark examiner for the Michigan State Police, examined the two firearms and the bullet and shell casing recovered from the crime scene. (ECF No. 12-8, Trial Transcript, PageID.786-99). Amley determined that the bullet and shell casing were both fired from the 9-millimeter pistol recovered from the crime scene. (*Id.*, PageID.799-803). An examination of the other weapon recovered from the crime indicated that it had not been fired. (*Id.*, PageID.804).

**<u>Aaron</u> <u>Smith</u>**

As of August 11, 2012, Smith was employed as a Detective with the Battle Creek Police Department. (ECF No. 12-8, Trial Transcript, PageID.806). On this date, Smith interviewed Petitioner regarding the events of the previous evening.

(*Id.*, PageID.806-08).    After being informed of his Miranda rights, Petitioner waived his right to remain silent and agreed to speak with Smith.    (*Id.*, PageID.809-10-80).[1] Petitioner stated that he went to Larry Evans' residence on the night in question to "buy a bag of weed."    (*Id.*, PageID.812).    When Smith informed Petitioner that Evans was dead, Petitioner responded that "he didn't hear any gunshots."    (*Id.*, PageID.813).    Smith, however, had not informed Petitioner that Evans had been shot.    (*Id.*, PageID.813-14).

**Brad Wise**

As of August 11, 2012, Smith was employed as a Detective with the Battle Creek Police Department.    (ECF No. 12-8, Trial Transcript, PageID.827-28).    On this date, Wise interviewed several of the people involved in the incident at 258 Algonquin.    (*Id.*, PageID.828-29).    Wise later obtained a DNA sample from Petitioner.    (*Id.*, PageID.829-32).

On August 17, 2012, Petitioner requested to speak with Wise.    (*Id.*, PageID.831-35).    At the outset, Petitioner indicated that he had since learned that Larry Evans had been shot on the night in question.    (*Id.*, PageID.836).    According to Petitioner, he walked alone from Kenneth Mack's residence to Larry Evans' house. (*Id.*, PageID.836-40).    Petitioner asserted that when he arrived at Evans' residence,

---

1 This interview was video recorded and played for the jury.    (*Id.*, PageID.811).    A transcript of the interview, however, is not included in the official record.    After the video of the interview was played for the jury, Smith was briefly questioned about certain matters regarding the interview.

13

the front door was "wide open."  (*Id.*, PageID.837).   Petitioner stated that he entered the house and observed DeShawn Colbert, Sr., "standing over" Evans.   (*Id.*). Petitioner "leaned over" Evans, which, according to Petitioner, is why his clothing might have been stained with blood.  (*Id.*, PageID.837-38).  As for how his DNA might have been discovered on one of the firearms recovered from the crime scene, Petitioner asserted that it had been "tossed in his lap."  (*Id.*, PageID.838-39).

Following the presentation of evidence, the jury found Petitioner guilty of first degree felony murder and armed robbery.  (ECF No. 12-10, Trial Transcript, PageID.893-95).   Petitioner was sentenced to serve life in prison without the possibility of parole on the murder conviction and, given his five previous felony convictions, Petitioner was sentenced to serve life in prison on the armed robbery conviction.   (ECF No. 12-11, Sentencing Transcript, PageID.906-07).

Petitioner appealed his convictions in the Michigan Court of Appeals asserting the following claims:

I.   There was insufficient evidence to convict the defendant of either first-degree felony murder or armed robbery.

II.   There was insufficient evidence before the trial court to support the finding that defendant aided and abetted the commission of a crime but counsel failed to present a substantial defense to guarantee a fair trial and show defendant's innocence.

The Michigan Court of Appeals affirmed Petitioner's convictions.   *People v. Nelson*, 2015 WL 2329059 (Mich. Ct. App., May 14, 2015).   Raising the same issues,

14

Petitioner unsuccessfully moved in the Michigan Supreme Court for leave to appeal. *People v. Nelson*, 875 N.W.2d 227 (Mich. 2016).

Petitioner later moved in the trial court for relief from judgment asserting the following claims:

I.    Trial counsel was constitutionally ineffective which denied defendant the right to a fair trial.

II.   The prosecutor denied defendant's state and federal constitutional right to due process through the presentation of known false testimony of prosecuting witness Kenneth Mack.

III.  Defendant was denied the right to a fair trial when the prosecutor improperly vouched for the credibility of Kenneth Mack.

IV.   Prosecutorial misconduct was committed requiring reversal when in closing the prosecutor made statements of fact to the jury that were not supported by the evidence.

V.    Newly discovered evidence entitles defendant to a new trial or complete exoneration due to actual innocence.

VI.   The trial court erred in pressuring the jury to reach a hasty verdict.

Petitioner's motion was denied.    (ECF No. 12-13, PageID.1016).    This determination was affirmed by both the Michigan Court of Appeals and the Michigan Supreme Court.    (ECF No. 12-16, PageID.1377; ECF No. 12-17, PageID.1498). Petitioner now moves for relief asserting the following claims:

I.    There was insufficient evidence to convict Petitioner of either first-degree felony murder or armed robbery.

II.   Trial counsel was constitutionally ineffective which denied Petitioner his right to a fair trial.

15

III.    Trial counsel was ineffective when he failed to motion the court to suppress contaminated evidence, and the trial court erred by allowing improperly introduced contaminated evidence to be argued at trial.

IV.    The prosecutor denied Petitioner his state and federal constitutional rights to due process through the presentation of known false testimony of prosecution witness Kenneth Mack.

V.    Petitioner was denied the right to a fair trial when the prosecutor improperly vouched for the credibility of Kenneth Mack.

VI.    Newly discovered evidence entitles Petitioner to a new trial or complete exoneration due to actual innocence.

VII.    Prosecutorial misconduct was committed requiring reversal when in closing the prosecutor made statements of fact to the jury that are not supported by evidence.

VIII.    The trial court erred in pressuring the jury to reach a hasty verdict.

## <u>STANDARD OF REVIEW</u>

Nelson's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.   The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."   *Bell v. Cone*, 535 U.S. 685, 693 (2002). As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet."  *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (internal quotation omitted).

Pursuant to Section 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).   A writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams,* 529 U.S. at 411.   Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Ibid.*

As previously noted, Section 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy either subsection therein. This requirement, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 562 U.S. 86, 100 (2011). Instead, if a state court rejects a federal claim, a federal habeas court "*must presume* that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

18

## ANALYSIS

### I.    Sufficiency of the Evidence

Petitioner argues that the prosecution presented insufficient evidence to support his convictions for first-degree felony murder and armed robbery.  Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.   *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury.   *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006).   Furthermore, where the record supports conflicting inferences the Court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."   *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Under Michigan law, the elements of armed robbery are: (1) an assault; (2) a felonious taking of property from the victim's presence or person; and (3) while the defendant is armed with a weapon.   *See People v. Rodgers*, 645 N.W.2d 294, 298

(Mich. Ct. App. 2001).   The elements of first-degree felony murder are: (1) the killing of a human being; (2) with malice;[2] (3) while committing, attempting to commit, or assisting in the commission of certain felonies, including armed robbery.   *See People v. Smith*, 733 N.W.2d 351, 365 (Mich. 2007).

Petitioner was convicted of these crimes based on an aiding and abetting theory.   A defendant is guilty of a crime, on an aiding and abetting theory, if the following elements are satisfied: (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave aid or encouragement.   *People v. Robinson*, 715 N.W.2d 44, 47-48 (Mich. 2006).

Petitioner does not dispute that a killing and armed robbery occurred in Larry Evans' residence on the night in question.   Rather, Petitioner argues that the prosecution failed to present sufficient evidence to convict him on an aiding and

_____

2 Malice is defined as "the intent to kill, an intent to inflict great bodily harm, or the wanton and willful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm."   *People v. Hopson*, 444 N.W.2d 167, 169 (Mich. Ct. App. 1989).   Malice may be inferred "from the facts and circumstances of the killing," *People v. Kemp*, 508 N.W.2d 184, 187 (Mich. Ct. App. 1993), including "evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm."   *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980).

abetting theory.   Interpreted in a light most favorable to the prosecution, the evidence established the following.

When officers arrived at Larry Evans' residence, a dispute was taking place inside as a man (or group of men) was trying to discover the location of drugs. Officers observed Petitioner standing inside a doorway to the house.   When instructed by officers to "step out and get on the ground," Petitioner refused and retreated inside the house interfering with law enforcement and providing the other men inside the house an opportunity to escape.   Larry Evans was killed during this encounter by a "gunshot wound to the head and multiple blunt force injuries."   Two firearms were discovered in the residence, one of which contained DNA for which Petitioner could not be excluded as a donor.   Likewise, Petitioner's shoes were stained with blood regarding which Larry Evans could not be excluded as a donor.

From this evidence, a reasonable juror could conclude that an armed robbery occurred at Larry Evans' residence in the course of which Evans' was killed.   A reasonable juror could further conclude that Petitioner knowingly and intentionally acted to assist the commission of these crimes.   *See, e.g., People v. Jackson*, 808 N.W.2d 541, 548 (Mich. Ct. App. 2011) (aiding and abetting encompasses "all forms of assistance rendered to the perpetrator, including any words or deeds that may support, encourage, or incite the commission of a crime"); *People v. Lindsey*, 2007 WL 3085455 at *4 (Mich. Ct. App., Oct. 23, 2007) ("Defendant aided and abetted the

commission of armed robbery, and one of the natural and probable consequences of such a crime is death.").

The Michigan Court of Appeals denied Petitioner's sufficiency of the evidence claims. *People v. Nelson*, 2015 WL 2329059 at *2-3 (Mich. Ct. App., May 14, 2015). This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim presents no basis for habeas relief.

## II.  Prosecutorial Misconduct

Petitioner asserts three claims of prosecutorial misconduct: (1) knowingly suborning perjury; (2) improperly vouching for the credibility of a witness; and (3) making arguments to the jury that were not supported by the evidence.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an

22

unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).   Thus, even if the challenged comments were improper, habeas relief is available only where the comments were "so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis.   The Court must first determine whether "the prosecutor's conduct and remarks were improper."   *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007).   If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal."   *Id.* at 759.   When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the comments were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.   *Id.*

It is not inappropriate for a prosecutor to "highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence."   *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005).   Likewise, the prosecutor is permitted to "point out the lack of evidence supporting [the defendant's] theories." *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005).   Nevertheless, a prosecutor may not "make unfounded and inflammatory attacks on the opposing

advocate," *United States v. Young*, 470 U.S. 1, 9 (1985), or "argue that counsel is attempting to mislead the jury."    *West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008).

A.    Suborning Perjury

As noted above, Kenneth Mack testified on direct examination that early on the evening of August 10, 2012, he encountered Petitioner and spoke with him on the phone approximately one hour later.  According to Mack, he did not encounter or speak with Petitioner again that evening.  Mack further testified that Petitioner's girlfriend asked him to falsely testify that Petitioner stayed with Mack on the evening of August 10, 2012.

On cross-examination, however, Mack acknowledged previously providing Petitioner's counsel with a different, and according to Mack, untruthful, description of events that supported Petitioner's theory that he ventured to Larry Evans' residence alone and was neither aware of nor involved with the events taking place therein.  (ECF No. 12-6, Trial Transcript, PageID.546-48).  Petitioner argues that he is entitled to relief because Mack's testimony on direct examination was false and knowingly elicited by the prosecutor.

It is improper for a prosecuting attorney to knowingly present false testimony. *See Brooks v. Tennessee*, 626 F.3d 878, 894-95 (6th Cir. 2010); *see also*, *Giglio v. United States*, 405 U.S. 150, 153 (1972) ("deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice"). Petitioner, however, has failed to demonstrate that Mack's

24

testimony on direct examination was false.  Moreover, even if the Court assumes such is the case, Petitioner has failed to establish that the prosecutor elicited such knowing that it was false.  The Michigan courts reasonably rejected this claim. Accordingly, this claim raises no issue on which habeas relief may be granted.

       B.    <u>Vouching for the Credibility of a Witness</u>

       Petitioner next argues that the prosecutor, in closing argument, improperly vouched for Mack's credibility thereby depriving Petitioner of the right to a fair trial.

       Improper vouching occurs "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the government behind that witness." *Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012).  Improper vouching generally occurs when the prosecutor makes "comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Id.*  A prosecutor is permitted, however, to "argu[e] reasonable inferences from the evidence." *Landis v. Galarneau*, 2012 WL 2044406 at *4 (6th Cir., June 7, 2012) (quoting *United States v. Collins*, 78 F.3d 1021, 1039-1040 (6th Cir. 1996)).

       The prosecutor is likewise permitted to "argue that the jury should arrive at a particular conclusion based upon the record evidence." *Wogenstahl*, 668 F.3d at 329; *see also*, *United States v. Reliford*, 58 F.3d 247, 250-51 (6th Cir. 1995) (so long as he does not improperly vouch for a witness, it is proper for the prosecutor to review the

evidence presented and comment on the strength of the State's case).    Finally, where there is conflicting testimony, "it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying."    *Collins*, 78 F.3d at 1039-1040.

Petitioner's claim of improper vouching is not based upon any statements the prosecutor made to the jury, but rather, is premised upon a brief exchange between the prosecutor and Kenneth Mack on direct examination.    The specific exchange at issue is as follows:

Q:    Did you meet with [Petitioner's] lawyer?

A:    Yeah, I have.

Q:    Was that after you spoke with Dominique?

A:    I really ain't for sure on that, but I know I came down here and talked to him though.

Q:    Did you tell him Cory was with you?

A:    Yes.

Q:    That's not the truth?
A:    No.

Q:    Mr. Mack, you're not on parole anymore, are you?

A:    No.

Q:    In fact, you're doing pretty well right now.    You have a job?

A:    Yes.

Q:    You have a girlfriend?

A:    Yes.

Q:     You're pretty stable.   You haven't gotten in trouble in quite a while have you?

A:     No.

Q:     Would you lie for [Petitioner]?

A:     Would I lie for him?

Q:     Yeah.

A:     No. No. . .

(ECF No. 12-6, Trial Transcript, PageID.546).

The Court discerns nothing improper about the prosecutor's questions.   The prosecutor did not express a personal belief in Mack's testimony or suggest that she was aware of any facts not presented to the jury.   Likewise, the prosecutor did not ask or encourage the jury to uncritically evaluate Mack's testimony or credibility. Instead, the prosecutor asked Mack simple, straightforward questions regarding relevant matters.[3]   The jury had the opportunity to observe Mack and assess his credibility.   Moreover, Petitioner was afforded the opportunity to cross-examine Mack about these and other matters.   The Michigan courts reasonably rejected this claim.   Accordingly, this claim raises no issue on which habeas relief may be granted.

---

[3] The prosecutor's questions regarding Mack's then current parole and life status was in response to Mack's testimony that he was confined to his grandmother's house on the night of Larry Evans' murder due to a parole violation.   (*Id.*, PageID.542-43).

C.    Making Improper Arguments

After the presentation of evidence, the prosecutor argued to the jury that Petitioner was a willing and active participant in the criminal activity that occurred in Larry Evans' residence on the night in question.    The prosecutor noted that Petitioner was inside the residence when the robbery occurred and when the police arrived, Petitioner did not "come running out going, hey, I just witnessed a murder." (ECF No. 12-9, Trial Transcript, PageID.872).    The prosecutor argued that Petitioner instead acted like "the lookout," refusing commands by the police and instead "buying more time for [his accomplices] to wipe guns, hide evidence, do whatever it is they needed to do."    (*Id.*).    The prosecutor argued that Petitioner's story that he was not involved in the robbery or killing of Larry Evans was a "lie" and, moreover, that Petitioner expected Kenneth Mack "to come in and support that story."    (*Id.*, PageID.873-74).    Petitioner argues that he is entitled to relief because these statements were improper and denied him the right to a fair trial.

The Court discerns nothing improper about the prosecutor's arguments.    The prosecutor was merely arguing reasonable inferences from the evidence and highlighting the shortcomings in Petitioner's version of events.    The Michigan courts reasonably rejected this claim.    Accordingly, this claim raises no issue on which habeas relief may be granted.

28

### III.    Jury Charge

The jury began deliberating on the afternoon of Friday, July 26, 2013.   (ECF No. 12-9, Trial Transcript, July 26, 2013, at 60-84).    The jury returned guilty verdicts on Tuesday, July 30, 2013.   (ECF No. 12-10, Trial Transcript, PageID.893-96). Petitioner argues that he is entitled to relief because on Monday, July 25, 2013, the jury communicated to the trial judge that it could not reach a verdict in response to which the judge improperly instructed the jury to continue its deliberations. Petitioner's argument suffers from two related shortcomings.    First, there is absolutely nothing in the state court record supporting Petitioner's claim. Furthermore, even if the Court accepts as accurate the "evidence" upon which Petitioner's argument is based, his claim still fails.

When a jury indicates an inability to arrive at a verdict, the trial judge may give a supplemental instruction encouraging the jury to continue deliberating.    *See Loza v. Mitchell*, 766 F.3d 466, 492 (6th Cir. 2014) (citing *Allen v. United States*, 164 U.S. 492, 501-02 (1896)).    Such supplemental instructions are constitutional so long as they are not coercive in light of the relevant context and circumstances.    *See Loza*, 766 F.3d at 492 (citing *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988)).    If the trial judge merely reminds the jurors to decide the case for themselves, but nevertheless encourages them to assess the reasonableness of their views in light of their fellow jurors' views, such is not coercive.    *See, e.g., Brown v. Bradshaw*, 531 F.3d 433, 436-37 (6th Cir. 2008) (quoting *Lowenfield*, 484 U.S. at 234-35).

29

The record contains no transcript or record of any proceedings on Monday, July 25, 2013, and Petitioner does not assert that any such transcript or record exists. Instead, Petitioner's argument is based upon a portion of what appears to be an article printed in the Battle Creek Enquirer on an unknown date. (ECF No. 1, PageID.29; ECF No. 12-12, PageID.976). Because Petitioner has failed to include the entire article, its subject cannot be determined with certainty. The Court will nevertheless assume for present purposes that the article concerns Petitioner's trial.

This newspaper article is not part of the official court record nor are its contents sworn to under oath. Thus, this "evidence" is insufficient to establish that there was any communication from the jury to the trial judge, or any response thereto, on Monday, July 25, 2013. Petitioner's claim fails for this reason alone. But, even if the Court assumes that the content of this newspaper article is accurate and sufficient to establish the facts underlying Petitioner's claim, the result is the same. The newspaper article contains nothing from which a reasonable person could conclude that the trial judge's supplemental instruction to the jury was improper or coercive. Moreover, the Court discerns nothing from the circumstances in which the trial judge's supplemental instruction was given which supports a finding that the instruction in question was improper or coercive. The trial was lengthy and the jury had, by the time of the alleged supplemental instruction, deliberated for barely one day. Accordingly, it was hardly coercive for the trial judge to encourage the jury to continue its deliberations.

The state courts denied Petitioner's claim.   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.    Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.    Accordingly, this claim presents no basis for habeas relief.

## IV.   Contaminated Evidence

Petitioner argues that he is entitled to relief because the DNA evidence introduced against him was "contaminated."   The Court is not persuaded.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.   *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).   Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict."   *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).   This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error.   *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law."   *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).   Rather, Petitioner must establish that his conviction violated the Constitution or laws of the United States.   *Id.*   In this respect, it is recognized that, "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate

31

due process and thus warrant habeas relief."  *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations that violate fundamental fairness "very narrowly."  *Bugh*, 329 F.3d at 512.   State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."   *Ibid*. Whether the admission of evidence constitutes a denial of fundamental fairness "turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor."  *Ege v. Yukins*, 485 F.3d 364, 375 (6th. Cir. 2007).

While Petitioner asserts that the DNA evidence in question was contaminated, he presents no proof that such was the case.   Instead, Petitioner argues that the process by which his clothing was collected, maintained, and tested was deficient, resulting in inaccurate and/or unreliable results.   The facts that Petitioner cites in support of his argument, while relevant, concern the weight to be given the evidence rather than its admissibility.   *See, e.g., Jernigan v. Edward*, 2017 WL 5159552 at *6-10 (S.D. Cal., Nov. 7, 2017) (because DNA analysis is deemed scientifically valid and, therefore, admissible, "errors in testing go to the weight, not the admissibility of the evidence").

32

The state courts rejected this claim.  This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## V.    Ineffective Assistance of Trial Counsel

Petitioner argues that he is entitled to relief on the ground that his trial attorney was ineffective thereby depriving him of the right to a fair trial. Specifically, Petitioner alleges that his attorney was ineffective in the following ways: (1) failing to object to the prosecutor presenting DNA evidence obtained from the weapons recovered at the crime scene; (2) not endorsing Kenneth Mack as a defense witness; (3) failing to move to quash the bind-over and dismiss the information; and (4) failing to move to suppress contaminated DNA evidence.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).  To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional

assistance." *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.   Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).   The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."   *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).   This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."   *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."   *Premo*, 562 U.S. at 122.   Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court

unreasonably applied the *Strickland* standard, review is "doubly" deferential.    *Ibid.*

(citations omitted).    As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.    Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).    When § 2254(d) applies, the question is not whether counsel's actions were reasonable.    The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

### A.    Weapons-Based DNA

As noted above, the prosecution presented evidence concerning the DNA obtained from the two handguns recovered at the crime scene.    Petitioner argues that his attorney should have objected to the admission of this evidence because it was unreliable and did not directly implicate Petitioner in the killing or robbery of Larry Evans.    As discussed above, however, Petitioner's arguments regarding the reliability and significance of the DNA evidence concern its weight not its admissibility.    While Petitioner has made several plausible arguments supporting his position that the DNA evidence should have been afforded limited weight, Petitioner has failed to establish that the DNA evidence in question was inadmissible. Thus, counsel cannot be faulted for failing to seek its suppression.

B.    Kenneth Mack

Petitioner argues that his trial attorney should have endorsed Kenneth Mack as a defense witness.   Petitioner argues that this tactic would have permitted him to pursue a "mere presence" defense.   Under Michigan law, "mere presence, even with knowledge that an offense is about to be committed or is being committed, is not enough to make a person an aider or abettor; nor is mere mental approval, passive acquiescence or consent sufficient."   *People v. Hough*, 2016 WL 4419133 at *3 (Mich. Ct. App., Aug. 18, 2016) (citations omitted).

Petitioner claims that out-of-court statements Mack made to his attorney supported a "mere presence" defense.   As noted above, however, Mack testified at trial that the statements he made to Petitioner's attorney, and on which this claim rests, were untruthful.   Petitioner fails to present evidence that endorsing Mack as a defense witness would have resulted in Mack providing substantially different testimony with respects to the facts relevant to any "mere presence" defense Petitioner may have pursued.   Thus, Petitioner cannot establish that his attorney was deficient or that any alleged deficiency prejudiced his defense.

C.    Bind-over and Information

Under Michigan law, the issues at a preliminary examination are simply whether a crime was committed and whether there exists probable cause that the defendant committed it.   *See People v. Yost*, 659 N.W.2d 604, 606-07 (Mich. 2003). Following a preliminary examination, Petitioner was bound over for trial on charges

36

of armed robbery and felony murder based on a finding that a crime was committed and that there existed probable cause that Petitioner (and others) committed both offenses.   (ECF No 12-2, 12-3, and 12-4).

Kenneth Mack did not testify at Petitioner's preliminary examination.   Mack later spoke with Petitioner's trial attorney and made statements that appeared to support Petitioner's claim that he was not involved in the robbery and murder of Larry Evans.   Petitioner argues that his attorney was deficient for failing to immediately move to dismiss the charges against him based on Mack's statements. Petitioner's claim fails for at least two reasons.

First, Petitioner has failed to establish that Mack, had he testified at the preliminary examination or otherwise provided sworn testimony on the issue whether there existed probable cause to charge Petitioner, would have testified consistent with his out-of-court statements to counsel rather than refute such as he did at trial.   Second, even if the Court assumes that Mack would have provided sworn testimony consistent with the statements he made to Petitioner's counsel, such does not diminish the overwhelming amount of other evidence the prosecutor presented at the preliminary examination which supported the decision to charge Petitioner.   Stated differently, even if the Court assumes that Mack would have testified consistent with his statements to Petitioner's attorney, such does negate or trump the other evidence of Petitioner's guilt.   Petitioner has failed to establish that any motion to dismiss the charges, based on Mack's out-of-court statements possessed

any chance of success.   As such, his attorney was not deficient for failing to assert such.

        D.    <u>Suppression of DNA Evidence</u>

Finally, Petitioner argues that his attorney was deficient for failing to move to suppress the DNA evidence presented at trial.   Again, the arguments Petitioner makes in support of suppressing the DNA evidence concern the weight of such evidence rather than its admissibility.   While Petitioner has made several plausible arguments supporting his position that the DNA evidence should have been afforded limited weight, Petitioner has failed to establish that the DNA evidence in question was inadmissible.   Thus, counsel cannot be faulted for failing to seek its suppression.

The state courts denied Plaintiff's ineffective assistance of counsel claims. This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, the court's decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim presents no basis for habeas relief.

## VI.   **Actual Innocence**

Lastly, Petitioner asserts that he is entitled to relief on the grounds that "newly discovered evidence" establishes that he is actually innocent of the crimes of which he was convicted.

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Court observed that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Id.* at 400, *see also*, *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) ("The Supreme Court has held that newly discovered evidence does not constitute a freestanding ground for federal habeas relief but, rather, that the newly discovered evidence can only be reviewed as it relates to an 'independent constitutional violation occurring in the underlying state criminal proceeding.'") (citations omitted).   As the *Herrera* Court stated, "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Herrera*, 506 U.S. at 400.

As discussed herein, Petitioner has failed to identify any error of federal or constitutional law that occurred during his trial or that has resulted from his conviction and imprisonment.   Accordingly, this particular claim is not cognizable and affords Petitioner no relief.   Furthermore, even if the Court could consider this claim, the result is the same as Petitioner has failed to establish that he was innocent of the crimes in question.

In support of his claim, Petitioner has submitted two affidavits executed by Deven Nelson.  (ECF No. 1, PageID.26-28).   In his affidavits, Nelson asserts the following.   Petitioner "knew nothing about what took place nor was he present when

the crime was committed."    Nelson went to Larry Evans' residence to "rob him of his marijuana" while Petitioner remained at Kenneth Mack's residence.    Petitioner later walked to Evans' residence to retrieve his car keys shortly after which the police arrived.    Petitioner intended to then exit the residence because he "had nothing to hide," but Nelson "pushed the door shut and ran out the front door."    Nelson wanted to testify at Petitioner's trial, but declined on the advice of counsel.

To establish that he is actually innocent, Petitioner must demonstrate that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him."    *Penney v. United States*, 870 F.3d 459, 462 (6th Cir. 2017) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).    Moreover, actual innocence "means factual innocence, not mere legal insufficiency."    *Penney*, 870 F.3d at 462 (quoting *Bousley*, 523 U.S. at 623-24).    The affidavits by Deven Nelson fall far short of this standard.

Nelson's assertions are inconsistent with much of the evidence presented at trial, most notably the testimony by Kenneth Mack that Petitioner was not at his residence that evening and Chad Fickle that Petitioner refused a command to exit Larry Evans' residence, and instead "slammed the door shut" and retreated inside. Moreover, Nelson's assertions do not diminish or refute the DNA evidence that supports the conclusion that Petitioner did not simply happen upon the scene of an already completed crime, but instead was present from the outset and participated therein.    In sum, Petitioner's "newly discovered" evidence fails to establish that "it

40

is more likely than not that no reasonable juror would have convicted him" had such evidence been presented at trial.

The state courts rejected this claim.   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

## **<u>CONCLUSION</u>**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.   Accordingly, the undersigned recommends that Nelson's petition for writ of habeas corpus be denied.   The undersigned further recommends that a certificate of appealability be denied.   *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

41

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).   Failure to file objections within the specified time waives the right to appeal the District Court's order.   *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: April 20, 2020                         /s/ Phillip J. Green
                                             PHILLIP J. GREEN
                                             United States Magistrate Judge